## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
## MILWAUKEE DIVISION

BDH, LLC,

        Plaintiff,

v.

                                      Case No.: _____

OUTDOOR PRODUCT INNOVATIONS, INC.,

        Defendant.

---

## COMPLAINT

---

NOW COMES the Plaintiff, BDH, LLC ("BDH"), by and through its attorneys, Barton Legal S.C., and for its Complaint against Defendant, Outdoor Product Innovations, Inc. ("OPI"), alleges and states as follows:

### OVERVIEW

1.      This is a case about OPI trying to get more for less. As a growing force in the hunting, fishing, and outdoor products industry, OPI actively solicited BDH, a former competitor, to acquire the latter's assets. OPI pushed to consummate the deal, so that it could: (a) begin selling treestands (BDH's main product) to meet industry demand; (b) remove competition from the marketplace; and (c) secure BDH's lucrative manufacturing connections in China.

2.      The transaction closed on favorable terms to OPI; save for $10.00 it was required to remit at closing, the asset purchase agreement ("APA") specified that OPI would pay approximately $2.3MM to acquire BDH's assets pursuant to a promissory note (the "Note"), which OPI would satisfy through: (a) sales of BDH's remaining inventory on hand at closing (the "Unsold Inventory"); and (b) future sales of BDH products in the years thereafter (the "Enumerated Products").

3.     In fact, OPI did not even have to physically ship BDH's Unsold Inventory to its facilities in Ohio; rather, this product remained in a third-party warehouse (paid for by BDH) that fulfilled and shipped it at OPI's direction. Thus, OPI obtained BDH's manufacturing connections, intellectual property, and immediate ability sell BDH's products for virtually *zero* capital investment.

4.     At closing and in the months thereafter, OPI repeatedly represented to the industry that the BDH acquisition was a homerun, telling one trade publication, for example, that: "*we could not have asked for a better kickoff to an acquisition than what we've had this year with [BDH].*"

5.     On information and belief, however, OPI never intended to consummate the deal pursuant to the APA's terms. Indeed, weeks after closing, OPI approached BDH and sought to renegotiate the parties' agreement and pay less for the Unsold Inventory. When BDH refused, OPI inserted its lawyers into the mix, who began saber rattling that BDH had committed serious breaches of the APA, which effectively goaded OPI into the deal.

6.     Of course, recanting the deal on OPI's end would have been a simple matter; it paid virtually no money up front, it never took physical possession of the inventory, and even weeks after closing, OPI still had not even delivered the Note. But OPI never took these steps. Quite the opposite, actually: it began heavily leveraging BDH's manufacturing connections, it kept selling BDH's product, and it began paying BDH pursuant to the terms of the Note.

7.     But when BDH began requesting information to ensure it was being compensated for the Unsold Inventory pursuant to the APA's terms, OPI refused. And despite making certain payments under the Note, OPI has yet to deliver it, apparently laboring under the misimpression that it can hold the Note hostage to somehow undermine its enforceability. All told, it appears as if OPI's sharp dealing has already cost BDH more than $600,000.

1

8.     And as the May 2021 correspondence from OPI's counsel makes clear, OPI has no intention of honoring its future obligations under the APA or Note. Thus, apart from its prior material breaches, OPI's anticipatory repudiation of the parties' contract has cost BDH millions. Accordingly, this action seeks to hold OPI accountable for its sharp dealing.

## PARTIES

9.     Plaintiff, BDH, LLC, (f/k/a Big Dog Hunting, LLC), is a domestic limited liability company organized and operated under the laws of the state of Wisconsin. From the time of its organization to present, BDH has had two members, Michael Coakley and Patrick McIntyre, both of whom are citizens of Wisconsin.

10.     On information and belief, Defendant, Outdoor Product Innovations, Inc., is a foreign corporation organized and operated under the laws of the state of Ohio, with its principal place of business located at 177 Reaser Court, Elyria, Ohio 44035.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1332(a)(1) & (c)(1) because BDH (via the citizenship of its members, *see* ¶ 9, *supra*) is a citizen of Wisconsin, OPI is a citizen of Ohio, and the matter in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and the remaining product inventory remains warehoused in this judicial district.

## FACTUAL ALLEGATIONS

### The Reaser Family Builds OPI, A Growing
### Force In The Outdoor Industry

13.     OPI has positioned itself as an industry leader in the hunting, fishing, and outdoor

2

industries, who prides itself on making top-quality, premium products for hunters and fishermen around the globe.

14.     On information and belief, OPI was founded in 2015 by its current President and CEO, Dan Reaser, Sr. ("Senior"), who, prior to founding OPI, served as the founder and chairman of HoodMart, Inc., a company specializing in the manufacture and distribution of commercial cooking equipment.

15.     Even prior to founding OPI, however, Senior and his family—including his son, Danny Reaser ("Danny"), who serves as OPI's Vice President—were quasi-celebrities in the outdoor industry. They have starred for many years on *The Outdoor Option*, a television series aired on the Pursuit Channel and available on YouTube that documents the Reaser Family's hunting, fishing, and outdoor adventures across North America.

16.     One of OPI's initial product lines that has been critical to its success is its hunting "ground blinds," which are manufactured under the name Rhino Blinds. These blinds, which OPI touts on its website as "America's Favorite Ground Blind," are camouflaged pop-up shelters for hunters and photographers that reduce their chance of detection while in the field.

17.     OPI's product line is not limited to these ground blinds, however. A key part of OPI's growth has centered on acquiring quality brands in the hunting industry and then increasing sales of these brands through its robust distribution network. As Senior explained his acquisition strategy in 2020: OPI "will continue to acquire companies we trust and believe in [which] has been key to our explosive growth."

18.     On information and belief, the Reaser Family has also successfully leveraged its quasi-celebrity status in the outdoor industry to increase the brand awareness of OPI's product line

through various strategic partnerships. In May 2021 alone, for example, OPI announced partnerships with Bone Collector, Real Tree Outdoors, and Remington Ammunition that, on information and belief, will prominently feature OPI's products.

### OPI Pushes To Acquire Big Dog Hunting, Seeking to Capitalize On BDH's Product Line As Well As Its Chinese Manufacturing Connections

19. Given OPI's continued success in the ground blind industry, it began exploring other product lines to improve its stature in the industry. As Senior explained, OPI's retail partners were requesting that OPI enter the treestand market, which served as a perfect companion to OPI's strong presence in the ground blind industry.

20. Accordingly, in approximately February 2020, OPI solicited Patrick McIntyre ("Pat"), the managing member of BDH, to discuss a potential acquisition.

21. Founded in 2005, BDH[1] was a leader in the treestand industry that focused on providing safe, comfortable products to its customers, coupled with a strong commitment to value.

22. BDH sold treestands under various brands, including its eponymous "Big Dog Treestand" line, the "LockJawz Treestand" line, and the "Advanced 'Take-Down' Treestand" line.

23. OPI and the Reaser Family were already familiar with the Big Dog brand, having used it products in the field and recognized their quality. Senior said as much when asked what made the BDH acquisition such a lucrative opportunity: "*Big Dog has provided industry-leading, innovative products that maintain a spotless safety record, allowing Big Dog Hunting to be one of the top treestand manufacturers in the country, year in and year out.*"

24. Left unsaid in Senior's interview, however, were additional (and incredibly

---

[1] Pursuant to the Asset Purchase Agreement ("APA") discussed below, the name "Big Dog Hunting" was sold to OPI and Big Dog Hunting, LLC changed its name to BDH, LLC. Accordingly, BDH refers to the Plaintiff herein as well as the activities of its corporate predecessor prior to the execution of the APA.

4

important) benefits that OPI also stood to gain through the BDH acquisition, including: (a) the ability to eliminate competition; and (b) access to BDH's manufacturing connections in China.

25. Regarding the former, BDH—in addition to being "one of the top treestand manufacturers in the country," (Senior's words)—also sold "Big Dog Ground Blinds," which directly competed with OPI's Rhino Ground Blinds. Accordingly, buying BDH allowed OPI to snub out the competition who OPI acknowledged was making admittedly quality products.

26. Regarding the latter, BDH had developed a relationship with a "factory director" in China named Mr. Qian Jun, a/k/a "Money," who used his extensive connections to negotiate the manufacturing and distribution of BDH's product lineup.

27. As a result of this relationship with Money, BDH was able to manufacture its products at a competitive market rate, thereby increasing its profit margins on the BDH goods sold throughout North America.

28. On information and belief, BDH's Chinese manufacturing connections were incredibly important to OPI because it was involved in a dispute with its then-current supplier that was inhibiting OPI's ability to timely and cost-effectively produce its growing product line.

29. From BDH's standpoint, the OPI transaction presented a lot of opportunity to sell BDH's product through OPI's robust distribution network. Although BDH had invested heavily in its manufacturing connections, building a North American distribution network would be capital intensive.

30. OPI already had this distribution infrastructure in place, however. On information and belief, OPI employed twenty-seven sales representatives across the country.

31. Further, given the Reaser Family's quasi-celebrity status in the hunting, fishing, and

5

outdoor industries, industries, BDH could capitalize on the sale of its products through the publicity garnered from the Reaser Family's TV series as well as the strategic partnerships that OPI formed with retailers and other industry leaders.

32.     As the parties began negotiating the terms on which OPI would acquire BDH, OPI and its accountant, Levis Seguin CPAs ("LSC"), furnished a list of due diligence items to better understand the nature of BDH's business.

33.     Given the number of acquisitions made in years' past, OPI, LSC, and its counsel were intimately familiar with the due diligence process. Indeed, Senior said that OPI's aggressive acquisition strategy was critical to OPI's growing success.

34.     At each turn, BDH furnished the materials requested as the parties worked to close on the deal. On information and belief, OPI, its accountant, and its counsel were actively involved in the transaction, including reviewing the due diligence materials and preparing the APA documents. Unlike OPI, however, BDH's counsel was not brought into the mix until the final stages of the transaction.

35.     On March 31, 2020, BDH and OPI consummated the sale and executed the APA. Attached hereto as ***Exhibit A*** is a true and correct copy of OPI's executed version of the APA, which appends thereto the signature page of BDH and its members.

36.     Even prior to closing, however, OPI was eager to consummate the deal as quickly as possible. In fact, OPI issued press releases announcing the BDH acquisition even before the APA was executed, as evidenced by this *Dear & Deer Hunting* article dated *March 26, 2020*:

6



Attached hereto as *__Exhibit B__* is a true and correct copy of this March 26, 2020 press release.

37. On information and belief, OPI pressed to close on the BDH acquisition as quickly as possible because OPI had a lucrative, time-sensitive opportunity with Walmart that was contingent on OPI being able to offer treestands for sale in its portfolio of hunting products.

### *The Terms Of The Asset Purchase Agreement*

38. The APA categorized three classes of BDH's assets: (a) the "Purchased Assets" that OPI acquired, as identified in Section 2.1(a)–(k), including the right to sell tree stands and other products under various brand names in the hunting industry (the "Brand Products"); (b) the "Unsold Inventory" in BDH's possession at the time of closing, which OPI also acquired pursuant to Section 2.2; and (c) the "Excluded Assets" that OPI did not acquire, which encompassed "any assets of [BDH] not specifically described in Section 2.1 [Purchased Assets] or Section 2.2 [Unsold Inventory] or otherwise addressed elsewhere in this [APA]." (*See generally* Ex. A, § 2.)

39. As noted above, apart from OPI's acquisition of the Purchased Assets and Unsold Inventory, OPI sought to acquire BDH's manufacturing connections in China. To that end, the

7

APA prevented BDH from conducting further business with Money because OPI wanted exclusive control of that relationship:

> **9.6** **Employment of Qian Jun.** Seller shall not employ, contract with, or otherwise conduct business with that certain individual named Qian Jun a.k.a. "Money" at any time after the Closing Date. Buyer shall assume all business commitments to Mr. Qian Jun as of the Closing Date.

(Ex. A, § 9.6; *see also id.*, § 9.3 (restricting BDH and its members from "interfere[ing] with any contractual or customer relationships of the Business in the Territory," which includes the "People's Republic of China").)

40. In exchange for OPI's acquisition of the Purchased Assets, Unsold Inventory, and the exclusive right to assume BDH's Chinese manufacturing connections, the APA provided that OPI would pay $10.00 at closing and execute a promissory note (the "Note") for $2.3MM.

41. This $2.3MM figure had two components: (a) the parties' assumption that the "Net Collections" (discussed *infra*) on the Unsold Inventory would fetch approximately $1.6MM by December 31, 2020; and (b) the greater of $700,000 or the royalties that BDH would earn on future sales of Enumerated Products (discussed *infra*) from April 1, 2021 to March 31, 2024 (the "Earnout").

42. Regarding the Unsold Inventory, the APA prescribed the following procedure to sell the product and meet OPI's obligations under the Note:

   a. OPI acquired title to the Unsold Inventory as of the closing date, but it remained stored at a third-party warehouse in Milwaukee (the "Milwaukee Warehouse"), the cost of which was borne by BDH.

   b. Customers would place orders for Unsold Inventory with OPI, which would then be sold and shipped pursuant to orders issued by OPI to the Milwaukee Warehouse.

   c. Although OPI had discretion to negotiate with its customers the terms on which they would buy the Unsold Inventory, OPI was still required to exercise "reasonable commercial judgment" in making these sales. (Ex. A, § 6.3.)

8

d.     The "Net Collections" received on the Unsold Inventory—i.e., the money collected by OPI for the sale of Unsold Inventory, "net of any discounts, freight/shipping charges, returns, credits, bad checks, and credit card chargebacks," (*see id.*, Sched. 1)—would be applied towards OPI's quarterly payment obligations under the Note.

e.     For any Unsold Inventory remaining in the Milwaukee Warehouse as of December 31, 2020, OPI agreed to pay BDH for its "Residual Value," pursuant to a formula in the APA. (*See id.* § 6.3.)

43.     As such, the Unsold Inventory's $1.6MM projected market value was subject to a potential downward adjustment if OPI—despite employing "reasonable commercial judgment," (*see id.*)—failed to successfully market and sell the product.

44.     Of course, BDH was willing to assume this risk because the historical profit margins on its products fell within the industry average of 25%–35%.

45.     Further, OPI's market power and industry presence—coupled with the addition of BDH's quality product line—created synergies that all but assured the Unsold Inventory would be disposed of at a profit that met or exceeded BDH's historical margins on its goods. Indeed, OPI represented as much in a May 21, 2020 interview with *Archery Business*:

> **AB:** Discuss the recent acquisition of Big Dog Hunting and why you feel it's important overall.
>
> **DR:** Outdoor Product Innovations will always look to acquire companies we trust and believe in. It's been key to our continued growth. We're excited about this acquisition of Big Dog Hunting as well as the products that come with it. Big Dog has provided industry-leading, innovative products that maintain a spotless safety record, allowing Big Dog Hunting the opportunity to be one of the top treestand manufacturers in the country year in and year out. Our retails partners have been asking us to enter the treestand category, and when you combine our leading distribution model, history of on-time delivery, and consistent sell-through results, adding treestands to the Outdoor Products Innovation family became a logical choice.

Attached hereto as **_Exhibit C_** is a true and correct of this May 21, 2020 interview snippet.

46.     Regarding the Earnout on "Enumerated Products," the APA prescribed a three-year period (the "Earnout Period") during which BDH would receive compensation on the "Net Sales" of the products identified in Schedule 13. (*See* Ex. A, § 6.4.) The procedure worked as follows:

9

a. The Earnout was broken down into three periods: (i) April 1, 2021 through March 31, 2022 ("Period One"); (ii) April 1, 2022 through March 31, 2023 ("Period Two"); and (iii) April 1, 2023 through March 31, 2024 ("Period Three"). (*Id.*)

b. The Enumerated Products encompassed the product line in BDH's current 2019–2020 catalogue as well as any new models or variations thereof; the only excluded products were hunting chairs and ground blinds, which OPI was already distributing.

c. The payment formula for each Earnout Period was identified in Schedule 6 wherein BDH would earn the greater of 3% on "Net Sales" of Enumerated Products or: (i) $200,000 for Period One ("the First Minimum"); (ii) $250,000 for Period Two (the "Second Minimum"); and (iii) $250,000 for Period Three (the "Third Minimum").

d. Payments would be made quarterly pursuant to the Note and at the end of each Period, if the sum of the preceding quarterly payments was insufficient to cover a given Minimum, the final payment for each Period would be increased to meet the applicable Minimum prescribed in Schedule 6.

47. Thus, the absolute floor that BDH would make pursuant to the Earnout was $700,000, which—along with the $1.6MM projected value of the Unsold Inventory—represented the face amount of the $2.3MM Note.

48. As all parties recognized, however, the total amount that OPI would ultimately pay to acquire BDH's assets was subject to adjustment based on OPI's ability to market and sell the Unsold Inventory by December 31, 2020 and the Enumerated Products over the Earnout Period.

49. Accordingly, the entire transaction was predicated on OPI's transparency in which it would disclose the quantity, price, and material terms on which its customers acquired the Unsold Inventory and Enumerated Products; information that was directly tethered to the overall value of the BDH acquisition, which BDH would receive in the years following the Closing Date.

50. To that end, the APA required OPI to furnish accurate information, including written calculations for the quarterly payments tendered pursuant to the Note, as well granted BDH audit rights to inspect the documentation supporting the calculations provided:

10

> **6.6** **Reporting.** In connection with the quarterly payments on the Note (Section 12 of this Agreement), Buyer shall provide Seller with written calculations of all payments made in a form that a CPA can trace to source documents. At the request of the Seller, on an annual basis Seller may engage an independent CPA to review with Buyer's CPA the calculations and back-up documentation for the prior twelve (12) month period. Any disputes between the CPAs shall attempt to be resolved by good faith negotiations between Buyer and Seller. In the event the good faith negotiations do not result in a resolution of the dispute, either party may seek judicial resolution of the dispute.

(*See* Ex. A, § 6.6.)

### *With BDH's Manufacturing Connection Secure, OPI Begins Raising Bogus Claims To Justify Its Non–Performance Of The Asset Purchase Agreement And Then Repudiates The Parties' Contract*

51.     Upon the parties' circulation of their respective signature pages for the APA on March 31, 2020,[2] OPI's counsel acknowledged that "*we have a deal*" and thanked everyone for their efforts to close on the transaction.

52.     In the weeks thereafter, BDH worked to fulfill its post–closing obligations under Section 7.2(b) of the APA, including by providing the documents set forth in Schedule 9.

53.     Three weeks after closing, however, despite OPI's counsel's acknowledgement that "we have a deal," and notwithstanding its obligations under Section 7.2(a)(iii) of the APA, OPI had still not delivered an executed copy of the Note.

54.     On or about April 21, 2020, OPI then approached BDH and offered to purchase the Unsold Inventory for its book value of approximately $1.1MM in cash, claiming that: (a) this would alleviate the need for the Note; and (b) streamline the APA's quarterly reporting process.

55.     BDH rejected OPI's offer, believing that OPI was simply attempting to pay less for the Unsold Inventory.

56.     Indeed, given the historical 30% profit margin on BDH's product line—a figure

---

[2] The APA contemplated that the agreement would be executed in counterparts. (Ex. A, § 15.8.)

11

lockstep with industry benchmarks—the market value of the Unsold Inventory was reasonably projected at approximately $1.6MM.

57.     Not only did BDH and OPI discuss these projections as part of the due diligence process, but OPI represented as much in the Note it signed: "*Maker* [OPI] *has received consideration which is the reasonable equivalent value of the obligations and liabilities that Maker has incurred to Payee* [BDH]." (*See* Ex. A, Sched. 12, § 6(d)) (emphasis added).)

58.     Further, OPI was already projecting to sell substantially all the Unsold Inventory by June 2020, less than three months after closing.

59.     Nor did OPI's quibbling about the ostensible burden of the (heavily negotiated) reporting process make sense. Regardless of how the parties addressed the Unsold Inventory, BDH's earnout on Enumerated Products necessarily required OPI's transparency, so BDH could ascertain how much product OPI sold and hence, the appropriate royalty earned.

60.     Weeks later, OPI began raising nebulous contentions about other facets of the transaction, which it wanted to address before delivering the Note. On May 8, 2020, for example, OPI's counsel stated: "*I acknowledge that I have not sent you the signed Note and my reason is that you previously sent me an unacceptable document purporting to assign this Note to [BDH's bank] . . . While you focus on the Note, which is signed, I point out the other items not fulfilled by [BDH] including Trademarks and Patents, insurance, and squabbling about pricing and shipping of goods from the Wisconsin warehouse.*"

61.     Yet each of OPI's ostensible justifications to delay delivering the Note was either wrong or swiftly resolved. As such, OPI grew more desperate, contending through its counsel in early June 2020 that the Advanced Treestand/LockJawz Products—approximately $250,000 of the Closing Inventory—likely had "little to no market."

12

62.     Despite the rhetoric in OPI's counsel's email, however, Senior stated otherwise in an interview with an industry publication, weeks prior:

> **AB:** Tell us more about the specific product lines and history of Big Dog Hunting.
>
> **DR:** The Big Dog Hunting brands consist of Big Dog Treestands, Big Dog Ground Blinds, LockJawz Treestands and Advanced "Take-Down" Treestands. Big Dog Hunting, a Milwaukee, Wisconsin based company since 2005, was founded on the premise of exceptional products and impeccable customer service. They focus on safety and comfort with a strong commitment to value. Big Dog products are tested to TMA and NSTM safety standards and trusted by industry experts everywhere. Big Dog Hunting supplies the industry with safety harnesses, ground blinds and a continuously-growing line of hunting accessories. Big Dog has always evaluated their product line to make design and quality improvements, creating industry-changing products. You can be confident and comfortable in your Big Dog products all season long.

(*See* Ex. C, *supra*.)

63.     On or about June 23, 2020, OPI's counsel clarified its position that $92,874.15 of the Unsold Inventory, which reflected the book value of certain LockJawz products, was "*unsellable and worth zero*" because of an alleged patent infringement issue.

64.     In fact, OPI's counsel purported to be so concerned about this issue to contend that "*OPI is certainly not going to sell those items or purchase those items being tainted as they are by the claim of patent infringement.*"

65.     Again, however, OPI's actions were not reconcilable with its attorney's rhetoric; the Milwaukee Warehouse records reflect that days after OPI raised grave patent infringement concerns that inhibited its ability from selling this product, OPI sold *all its LockJawz inventory* days later.

66.     Indeed, as Senior was acutely aware, numerous companies in the treestand industry received a similar letter from the same patent troll, yet the alleged "claim of patent infringement" never came to fruition; precisely why OPI felt sufficiently comfortable to sell this product despite its counsel's alarmist rhetoric to the contrary.

67.     By June 30, 2020, the close of the initial quarter under the APA, OPI still had not delivered the Note and was levying serious accusations that it was duped into the BDH deal.

13

68.     Come July 15, 2020, however, OPI tendered a $213,272.32 check to satisfy its first quarterly payment obligation under the APA (for the period running April 1, 2020 through June 30, 2020).

69.     Although OPI furnished the check, it never provided a calculation or sufficient documentation to reconcile these amounts as required under the APA.

70.     Similarly, on or about November 15, 2020, OPI—despite its ongoing failure to deliver the Note—issued a second check in the amount of $350,592.84 for the quarter running from July 1, 2020 through September 30, 2020.

71.     As with its previous check, however, OPI failed to provide any information that could remotely be used to determine the price at which OPI was disposing of the Unsold Inventory.

72.     Thus, on November 25, 2020, one of BDH's members, Mike Coakley ("Mike")—who owns the Milwaukee Warehouse and whose team was responsible for fulfilling orders of the Unsold Inventory—contacted OPI to raise his concern about the lack of information being furnished with the July 2020 and November 2020 checks; information that was necessary to ensure the Unsold Inventory was being disposed of on commercially reasonable terms.

73.     After debunking a host of OPI's other unfounded contentions in December 2020, Mike explained that upon BDH's receipt of the final quarterly payment for 2020 (due on or before February 15, 2021), BDH intended to exercise its rights to conduct an audit pursuant to the APA.

74.     On or about February 15, 2021, OPI tendered a check in the amount of $272,487.78 that ostensibly covered the quarterly period from October 1, 2020 to December 31, 2020.

75.     As with the two previous checks, however, OPI failed to provide any information that would otherwise be necessary to properly reconcile the shipments of Unsold Inventory that

14

BDH's warehouse made on OPI's behalf.

76. Accordingly, on or about February 18, 2021, BDH attempted to exercise its rights under Section 6.6 by retaining an accounting firm to conduct an independent audit. Attached hereto as ***Exhibit D*** is a true and correct copy of this correspondence.

77. This correspondence also presented a table to OPI, which demonstrated that per the Milwaukee Warehouse's records identifying its shipments of Unsold Inventory on OPI's behalf, approximately $1.0MM of the $1.1MM in Unsold Inventory (at book value) had been acquired by OPI's customers. (*See id.*) Thus, when one applied the "reasonable commercial guidelines" to reflect the profit margin at which one would expect this product to be sold, Mike/BDH estimated that the previous orders of Unsold Inventory placed by OPI's customers totaled approximately $1.43MM.

78. Mike then subtracted from this figure the quarterly payments OPI previously made to BDH without any calculations or support; all told, it appeared that OPI owed BDH approximately ***$600,000*** in additional proceeds from prior sales of Unsold Inventory.

79. When added to the remaining amount of Unsold Inventory at the Milwaukee Warehouse (an additional $95,000 in book value), it appeared as if OPI was shorting BDH on the Unsold Inventory calculation by approximately ***$700,000***.

80. In response, OPI's counsel scoffed at the suggestion that more money was owed for the Unsold Inventory, contending that "BDH was not a successful business, many of its products did not have strong market appeal, and the value of its inventory on its books was overstated compared to market values." OPI's counsel also explained that his client had "buyer's remorse" based on alleged misrepresentations that likely voided the APA:

15

> This unnecessary friction between our clients gives us buyer's remorse in making the deal for the assets of BDH. We feel that the Seller misrepresented the facts and has failed to provide all that was promised. After resolution of the minor details of the sale of the existing inventory, there is the matter of future payments under the Purchase Agreement. This assumes that the Asset Purchase Agreement was not otherwise voided by the actions and misrepresentations of the Seller.

Attached hereto as **_Exhibit E_** is a true and correct copy of this March 5, 2021 correspondence.

81. On March 24, 2021, days before the close of the first quarter in 2021, OPI's counsel then wrote directly to Mike, contending that Pat "*deceived us as to the facts in order to induce our signature on the APA*" and—consistent with what Senior attempted to do *just weeks* after closing—sought to renegotiate the deal:

> My point is that your prior lack of involvement may be coloring your perception of the facts and of the breaches of the APA by Pat McIntyre. We believe that Pat deceived us as to the facts in order to induce our signature on the APA. From your comments, it appears that he has also misled you regarding the deal and his misrepresentations and breaches of the terms.
>
> Since both sides appear to be mutually unhappy with the present arrangement, it behooves us both to renegotiate the deal. Any trial judge would throw the parties into a conference room with the command to work out a business settlement. In a business deal gone bad, it is still a business deal to be resolved, not a matter of law to be decided.

Attached hereto as **_Exhibit F_** is a true and correct copy of this March 24, 2021 correspondence.

82. OPI's counsel also reiterated that OPI had no intention of complying with BDH's contractual right to information, nor would it agree to an audit, (*see* Ex. A, § 6.6), until BDH provided certain "accounting records" that OPI claimed were ostensibly required to be produced under the APA. (*Id.*)

83. Apart from OPI's concrete lack of understanding regarding the parties' contractual obligations, its counsel's contentions were baseless. The simple truth is that OPI would have never consummated the transaction without receiving precisely the sort of financial information about BDH and its products that OPI requested during the due diligence phase of the transaction.

84. Thus, not only was all the information that was previously requested provided, but

16

BDH complied with its post-closing obligations to provide additional accounting records as set forth in the APA. (*See* Ex. A, § 7.2(b)(iv); *see also id*. Sched. 9 (describing the information to be produced, yet nowhere suggesting that BDH was obligated to provide the scope and extent of material that OPI claimed was now necessary for it to comply with the APA).)

85.     Further, the price at which OPI disposed of the Unsold Inventory, including the terms thereof—*i.e.*, the exact information needed to reconcile the quarterly payments to which BDH had a contractual right under the APA—could easily be furnished to support the parties' projected market value of the Unsold Inventory at $1.6MM.

86.     On information and belief, however, OPI has refused to provide this information because it will conclusively demonstrate that: (a) OPI failed to employ "reasonable commercial judgment" in disposing of the Unsold Inventory; and/or (b) the demand for BDH's products in the marketplace which—when coupled with OPI's distribution strategy and strategic partnerships—would project for Earnout returns that dramatically exceeded the $700,000 in minimum payments that OPI was already obligated to make.

87.     Pursuant to the terms of the APA and corresponding Note, OPI's 2021 First Quarter Payment was due on May 15, 2021, forty-five days from the close March 31st close of the quarter.

88.     OPI never made this payment, however.

89.     On May 18, 2021, three days after OPI's quarterly payment was due, OPI's counsel repudiated the APA, contending that ostensible "violations of the representations and warranties by BDH to be so severe *as to invalidate the contract made between the parties*[:]"

17

> I also want to disabuse your unfounded expectation of additional proceeds from the sale of the Big Dog inventory existing as of March 2020. The marketability and value of the inventory on hand as of March 31, 2020 was not as represented by Pat McIntyre. Nor was the future sale of various "branded" products actually a sustainable business. What was represented during negotiations for the APA as sustainable BDH business lines were found to be not true. Nor did OPI receive the very important accounting records referenced in the prior paragraph above. These actions collectively is a material violation of the representations and warranties given by BDH to induce OPI into entering into the terms of the APA. We consider the violations of the representations and warranties by BDH to be so severe as to invalidate the contract made between the parties. Even if a court should find that some kind of contract was in place, our position is that BDH has breached that contract with OPI thereby causing damages to OPI and impossibility of future performance.

Attached hereto as ___*Exhibit G*___ is a true and correct copy of this May 18, 2021 correspondence.

90.    OPI's counsel's May 18, 2021 letter echoed his prior correspondence in which he claimed that "*BDH was not a successful business, many of its products did not have strong market appeal, and the value of its inventory on its books was overstated compared to market values.*"

91.    Yet again, however, OPI had something entirely different to say in the December 2020 issue of *Inside Archery*, when it extoled the synergies gained from the BDH acquisition, boasted about the quality of BDH's products, and stated that OPI "*could not have had a better kickoff to an acquisition that we had this year with Big Dog*[:]"

> One of the most recent additions to OPI is Big Dog Hunting, which joined the team earlier this year.
> "With as big as we have become in the ground blind industry, it was sort of inevitable for us to eventually get into the treestand industry," Danny Reaser said. "Just like every other brand we acquired, we had already used Big Dog products and recognized it as a quality brand. We thought we could bring it into our OPI family and help it grow tremendously, and we could not have asked for a better kickoff to an acquisition than what we've had this year with Big Dog. The company already had a strong dealer base, and we've been able to combine that with our retailer base. We have been extremely happy with the sales and growth that Big Dog has experienced this year, and we have some things in store that will make next year even better."

Attached hereto as ___*Exhibit H*___ is a true and correct copy of interview with OPI, which appeared in the December 2020 issue of *Inside Archery*.

18

92.     In fact, OPI continues to market and sell Big Dog tree stands on its website, informing its customers that, amongst other representations:

- *"Big Dog Hunting has been a leader in the tree stand industry."*
- *"Big Dog products are tested to TMA and NSTM safety standards, and are trusted by industry experts all across North America."*
- *"With Big Dog treestands, you can be confident and comfortable all season long."*

93.     On information and belief, OPI never had any intention to consummate the parties' transaction on the terms set forth in the APA; rather, it goaded BDH into a deal structure that gave it leverage to renegotiate the transaction by obfuscating the information required to ensure BDH would be compensated for the sale of its assets.

### COUNT I: BREACH OF CONTRACT / SPECIFIC PERFORMANCE
### (Asset Purchase Agreement)

94.     BDH repeats and realleges the preceding paragraphs as if fully set forth herein.

95.     On March 31, 2020, OPI and BDH executed the APA, a valid contract.

96.     The APA imposes numerous obligations on the parties thereto, including but not limited to identifying the parties' post-closing responsibilities and deliverables.

97.     BDH has performed all of its obligations under the APA.

98.     OPI has failed to adhere to its obligations, however, including but not limited to by: (a) refusing to deliver the Note (despite selectively complying with its certain payment obligations thereunder); (b) failing to produce the information and calculations necessary to reconcile the quarterly payments OPI selectively made; and (c) thwarting BDH's efforts to invoke its audit rights.

99.     On information and belief, OPI has actively withheld this information to deprive BDH of its ability to reconcile and account for certain payments made for the Unsold Inventory under the APA.

19

100. Indeed, a review of the Milwaukee Warehouse fulfillment records compared against the book value of the Unsold Inventory, OPI has sold approximately $1.0MM in Unsold Inventory (*at cost*), yet made payments totaling approximately $836,000.

101. Yet if one assumes that OPI employed "reasonable commercial judgment" in disposing of the Unsold Inventory—i.e., selling the Unsold Inventory at its historical margins—then approximately ***$600,000*** is unaccounted for.

102. Thus, by depriving BDH of its contractual right to information and transparency, OPI has sought to profit from obfuscating the source documents needed to determine how much BDH is owed on the Unsold Inventory.

103. Not only does this appear to be more than $600,000, but OPI's refusal to provide this information has also inhibited BDH and its members from preparing their 2020 taxes.

104. As a result of this significant damage that BDH has sustained, it hereby requests the Court to award specific performance and compel OPI to: (a) produce the relevant information needed to reconcile the terms on which the Unsold Inventory was disbursed; and (b) submit to an independent audit as the APA requires.

## COUNT II: BREACH OF CONTRACT / ANTICIPATORY REPUDIATION
### (Asset Purchase Agreement)

105. BDH repeats and realleges the preceding paragraphs as if fully set forth herein.

106. On March 31, 2020, OPI and BDH executed the APA, a valid contract.

107. The APA imposes numerous obligations on the parties thereto, including but not limited to identifying the parties' post-closing responsibilities and deliverables.

108. BDH has performed all of its obligations under the APA.

109. As discussed above, however, OPI has repeatedly failed to do the same, including but

not limited to by failing to provide information necessary to reconcile its quarterly payments made pursuant to the APA and corresponding Note.

110.    OPI then failed to make any payment for the residual Unsold Inventory by the close of the first quarter of 2021 that, per the terms of the Note, was due on or before May 15, 2021.

111.    Apart from OPI's failure to timely pay for, and provide adequate information concerning, the Unsold Inventory it purchased pursuant to the APA, OPI remains obligated to make future payments to BDH during the Earnout Period pursuant to Schedule 6 of the APA.

112.    On May 18, 2021, however—after OPI failed to timely make its final payment for the Residual Inventory—OPI's counsel unequivocally repudiated the APA, explaining that OPI "*consider[ed] the [alleged] violations of the representations and warranties by BDH to be so severe as to invalidate the contract made between the parties*." (*See* Ex. H (emphasis added).)

113.    And even if "a court should find that some contract was in place," OPI's counsel continued, OPI raised "*the impossibility of future performance*" because of BDH's alleged breaches (*Id.* (emphasis added).)

114.    OPI's position could not be clearer: it manifested an unequivocal intention to no longer perform its future obligations under the APA, including by furnishing the Minimum Payments specified in Schedule 6.

115.    BDH has therefore been damaged by OPI's anticipatory repudiation of the APA in an amount to be determined at trial.

## RELIEF SOUGHT

**WHEREFORE,** BDH respectfully requests the following relief, as allowed pursuant to the above-referenced facts, the applicable caselaw, and the governing statutes:

21

**(A)** That the Court declares and orders that:

    **(1)** OPI must furnish the necessary information for each quarterly payment made for the Unsold Inventory; and

    **(2)** OPI's failure to effectuate delivery of the Note has no bearing on BDH's enforcement thereof, given OPI's acknowledgement that it was signed and partial compliance with its payment obligations thereunder.

**(B)** That the Court awards compensatory and/or restitutionary damages as appropriate;

**(C)** That the Court awards punitive and/or exemplary damages in accordance with applicable law;

**(D)** That the Court awards BDH's costs and attorneys' fees incurred in connection with prosecuting this action; and

**(E)** That the Court award any other relief it deems just and equitable under the circumstances.

*BDH DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE*

Dated this 22nd day of June, 2021.

**BARTON LEGAL S.C.**

*/s/ Electronically Signed By James B. Barton*
James B. Barton
Email: *jbb@bartonlegalsc.com*
Joshua S. Greenberg
Email: *jsg@bartonlegalsc.com*
313 North Plankinton Ave., Ste. 207
Milwaukee, WI 53203
T: (414) 877-0690
F: (414) 877-3039

*Counsel for Plaintiff, BDH, LLC*

22